[No. 13853. Department Two. June 20, 1917.]

## I. C. PARKER, *as Administrator etc., et al., Respondents,* v. SEATTLE LAND & IMPROVEMENT COMPANY, *Appellant.*[1]

BROKERS — CONTRACTS — PERFORMANCE — EVIDENCE—SUFFICIENCY. Findings that a broker was authorized to sell lots for $9,500, which was but $100 less than the price authorized by the contract, are sustained where a witness testified that such authority was given in consideration of the broker's agreement to make up the $100 on sales of other lots, which was done, and the testimony of the plaintiffs to the effect that they demanded $10,000, which was $400 more than the contract gave them, and that the broker agreed to throw off $500 in commissions, was highly improbable.

SAME. The claim of owners that a broker attempted to deceive them by representing that a sale of lands to a city for a park was made for $25,000 instead of $30,000 received, and that $5,000 was unlawfully retained, is not sustained, where the sale was public and a matter of notoriety, the price was paid by city warrant to the president of the broker, a man possessed of the trust and confidence of the business world, who testified that the $5,000 was retained under an express agreement to be accounted for at the expiration of the contract, under which commissions had then been earned on sales amounting to $40,000.

SAME—COMMISSIONS—DEDUCTION FROM PAYMENTS. Where a broker was to receive commissions when the aggregate sales amounted to $40,000, it was not required to pay over the money on the last sale, but could deduct its commissions and pay over the balance due.

SAME—CONTRACT FOR COMMISSIONS—RIGHT TO TERMINATE. A repudiation of a broker's contract is not warranted because of the broker's refusal, on demand for an accounting, to accede to the owners' demands, where there was a *bona fide* dispute as to the amount due and no settlement could be reached.

SAME—RIGHT TO COMMISSIONS—TIMELY PERFORMANCE—TENDER. A broker procures a purchaser able and willing to take the property and is entitled to its commissions, where, upon the owners' refusal to execute a deed with an unauthorized condition as to payment, it procured the full cash price and tendered the money within the time limit of the contract and demanded a deed in the name of the purchaser which tender and demand the owners refused.

SAME—PERFORMANCE—TENDER—SUFFICIENCY. Where the owners, within the limit of a broker's contract, refused a tender of the full

[1]Reported in 165 Pac. 1086.

cash price, the broker earned its commissions and is not required to keep the tender good by a deposit, since the owners' failure to accept the tender within a reasonable time makes the default their own.

SAME. Under a contract, authorizing a broker to sell lots at fixed prices, which it was to collect and account for, in order to entitle the broker to a performance, it was not necessary to tender in excess of the contract price.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered July 28, 1916, upon findings in favor of the plaintiffs, in an action for an accounting, tried to the court. Reversed.

*Kerr & McCord*, for appellant.
*Halverstadt & Clarke*, for respondents.

FULLERTON, J.—This is an action for an accounting. It was originally brought by Isaac Parker and Lydia G. Parker, his wife, against the Seattle Land & Improvement Company. After the issues had been framed and the evidence in the case taken, and while the trial court held the cause under advisement, Isaac Parker died, and I. C. Parker, the administrator of his estate, was substituted as a party plaintiff in his stead. This appeal is by the defendant, the Seattle Land & Improvement Company, and for convenience we shall refer to the parties as appellant and respondents as though no substitution had been made.

The facts giving rise to the controversy are in the main undisputed. On August 30, 1908, and for some years prior thereto, the respondents were the owners of a tract of land, ten acres in area, situated in that part of the city of Seattle formerly comprising the city of Ballard, which they had caused to be platted under the designation of Parker's addition to the city of Seattle. The appellant is a corporation engaged in the general real estate and brokerage business. On the date named, the parties entered into a written contract by which the appellant undertook to sell for the re-

spondents the real property mentioned, the material parts of the contract being as follows:

"(1) The first parties hereby give and grant to the company until August 20th, 1910, the sole and exclusive right to sell for them the following real estate, lying and being in King county, Washington, to-wit: Parker's Addition to the City of Seattle.

"(2) The company may sell said real estate, or any part thereof, for cash or on deferred payments, but no lot in block one (1) of said addition shall be sold for less than the sum of $300; no lot in blocks two (2) and three (3) of said addition shall be sold for less than the sum of $600; and no lot in block four (4) of said addition shall be sold for less than the sum of $300. No lot in said addition shall be sold on deferred payments for less than one hundred dollars ($100) cash upon execution and delivery of contract of sale therefor, and ten dollars ($10) monthly thereafter until the full purchase price thereof shall be paid, with interest on deferred payments at the rate of seven (7) per cent per annum, interest payable monthly. Should more than one lot be sold on the same contract, the same cash and monthly payment shall be required for each lot so sold.

"(3) The company shall advance to the first parties the sum of ten thousand dollars ($10,000), without interest, payable as follows: five hundred dollars ($500) cash upon the execution and delivery of this agreement, the receipt whereof is hereby acknowledged, and nine thousand five hundred dollars ($9,500) within —— days after date hereof. Said sum shall be retained by the company out of the first moneys received by it hereunder.

"(4) The first parties shall secure, at their own expense, and furnish to the company, one abstract of title to said real estate, certified to by some responsible abstract company doing business in the city of Seattle. The company shall, at its own cost, furnish such additional abstracts of title to said real estate as may be necessary.

"(5) The first parties shall execute and deliver to purchasers of said property deeds thereto when the purchase price thereof has been fully paid. They shall also execute and deliver to purchasers of said property sold on deferred payments contracts of sale therefor as the same is sold, but all such deeds and contracts shall be subject to taxes and assess-

ments for local improvements which may become payable, or a lien on said property subsequent to date hereof.

"(6)　The company shall hold the first parties and said property harmless from any and all taxes and assessments on said property which shall become a lien on the same, or payable, subsequent to date hereof and prior to full payment for said property.

"(7)　All deferred payments shall be collected by the company and it shall account to the first parties on the first day of each and every month hereafter, in detail, for all sales and collections made by it during the preceding month.

"(8)　The company shall receive as and for its full compensation for services rendered hereunder, and in full payment for any disbursements made by it hereunder, the following: Five per cent (5%) of the first ten thousand dollars ($10,000) of the aggregate sale price of said property; two and one-half per cent (2½%) of the balance of the aggregate sale price of said property up to forty thousand dollars ($40,000); and one-half (½) of the gross aggregate sale price of said property over forty thousand dollars ($40,000). No part of said commission or compensation shall be due or payable until the company shall have sold in the aggregate property to the extent of forty thousand dollars ($40,000), and shall be payable only out of moneys thereafter coming into its possession hereunder."

Acting under and in pursuance of the contract, the appellant found purchasers to whom deeds were issued by the respondents for all of the property, save and except eleven lots in block one and one lot in block four. Of the property so sold, sixteen lots were sold to a school district of King county for the sum of $9,500, forty-eight lots to the city of Seattle for the sum of $30,000, and the remainder to individual purchasers, the total of such individual sales aggregating $2,550.

The present action was begun after the time limit for selling the property fixed in the contract had expired. In their complaint the respondents alleged that the total sales aggregated the sum of $42,050; that the appellant had suffered taxes and assessments to accumulate on the unsold property in

the sum of $837.47; that it had received $5,000 of the purchase money for which it had not accounted; that it had waived its commission on the first $10,000; that it was entitled to commissions on the remaining sales aggregating $1,775, and that there was due the respondents the sum of $4,037.47, with interest at the legal rate on $3,200 thereof from May 20, 1909, and interest on $837.47 thereof from the date of the commencement of the action. The appellant put in issue by denials the allegation that it had waived a part of its commission, and the allegations of the account as stated by the respondents. By way of an affirmative answer, it alleged a sale of all of the property in accordance with the terms of the contract, the sales aggregating $45,650, on which it was entitled to a commission of $4,075; and that it had paid, after deducting the commissions, all that remained due the respondents, except a balance of $422, which it tendered and paid into the registry of the court for the use of the respondents. The sales included a sale alleged to have been made to one Isabella Whyte of the twelve lots for which the respondents refused to issue a deed. For reply the respondents denied the affirmative allegations of the answer, and as a special defense to the allegation concerning the sale to Isabella Whyte, alleged that the appellant had, prior to such alleged sale, refused to account for moneys received by it from sales then made, and that the respondents had notified the appellant that they would not proceed further under the contract.

The cause was tried and submitted to the court on March 12, 1914. The court rendered its decision on June 28, 1916. The third finding of fact embodies the substance of the findings, and reads as follows:

"That at the time of signing said agreement, the defendant paid to the plaintiffs the sum of $500, but no more; that thereafter, during the time of said contract, the defendant sold all of said real estate, mentioned and described in said agreement, except lots one to eleven (1 to 11), both inclusive, block one, and lots one and two (1 and 2) block four (4) of

said Parker's addition to the city of Seattle, for the sum of $42,050. That the last sale of said property was made on the 20th day of May, 1909. That defendant earned as its commission, according to the terms of said agreement, the sum of $2,275. That defendant received on account of the sales of said real estate the sum of $42,050, and has paid to the plaintiffs the sum of $37,050, and no more. That on the 20th day of August, 1910, the date of the expiration of said agreement, there were general taxes upon the portion of said Parker's addition not sold by the defendant, to wit: lots one and two, block four, and lots one to eleven, both inclusive, block one, amounting to $50.69, and assessments for local improvements levied by the city of Seattle amounting to $456.85, no part of which the defendant has paid."

From the findings the court concluded that the respondents were entitled to recover from the appellant $2,225, with interest from May 20, 1909, and the sum of $507.54, with interest from August 20, 1910, together with the costs of the action, and rendered judgment accordingly.

The evidence developed three principal controversies; (1) whether the appellant had waived its commission on the first $10,000 of the sales; (2) whether it had wrongfully refused to account for the moneys received from the sales; and (3) whether respondents were in the wrong in refusing to recognize the sale made to Isabella Whyte. The first controversy arose out of the sale of the tract to the school district. The respondents testified that they wanted $10,000 for the lots comprised in this tract; that the school district offered and would pay but $9,500, and that they consented to the sale on the promise of the appellant that it would waive its commission which would equal the difference, namely $500. The president of the appellant, who had charge of the negotiations, one Fred E. Sander, denies these statements. He points out that the respondents had no right to exact $10,000 for the lots as a condition to making a deed thereto; that, by the terms of the contract, the appellant had the right to sell them for $9,600, and that the price for which they were sold was but $100 less than the contract price. His version of

the matter is that the respondents consented to make the deed
for the price at which they were sold, on his promise to make
up the difference of $100 on subsequent sales, which difference
was made up by the subsequent sale to the city of Seattle,
that sale being for $1,200 in excess of the price of the lots as
listed in the contract. We are constrained to adopt the ap-
pellant's view of the matter. It could have compelled a deed
to the property by paying the difference between the price
for which the land was sold and the price at which, by the
terms of the contract, it was at liberty to sell it. Since its
interest in the matter was the commissions it was to receive, it
is highly improbable that it would have sacrificed $400 for
the sake of saving $100.

The second controversy is material here only as it affects
the third. If the appellant did wrongfully refuse to account
for all of the money received from the sales as made, it may
be that the respondents were justified in refusing to recognize
the last of the sales made by the appellant. The controversy
arises out of the sale to the city of Seattle. This was the last
of the sales made for which deeds or contracts were executed.
On its completion, the appellant retained from the purchase
price received the sum of $5,000. Mr. Sander testified that
the sum was retained under an express understanding and
agreement with Isaac Parker, to be accounted for on the ex-
piration of the terms of the contract. The respondents de-
nied the agreement, testifying that the appellant undertook
to deceive them; that it was first contended by Mr. Sander
that $25,000 was the sum received for the property, and
that he afterwards admitted that the sale was for $30,000, but
claimed that the $5,000 had to be used for the purpose of con-
summating the sale, some of it being used to bribe certain of
the officials representing the city. It seems to us that, meas-
ured by probabilities, the appellant's version of the transac-
tion is the more rational and believable of the two. The city
purchased the property for use as a park. In the transac-
tion, it was represented by its park board. The purchase was

a matter of public notoriety. The title to the property had to be approved by the corporation counsel. The purchase price was paid by a warrant drawn on the city treasury. The park board was composed of men of the highest reputation for probity and integrity. Seemingly, in the light of these facts, no one would have supposed for a single instant that the densest ignorance could be imposed upon by so wild a tale. The record shows that the president of the appellant was possessed of such trust and confidence in the business world as to enable him to borrow on behalf of his company a large sum of money. Characters are not formed in a day, and it is almost beyond belief that a man having a reputation for integrity of this sort would even have attempted to deceive, much less is it believable that he would have attempted to deceive by false representations concerning matters the truth of which, if not already known, could have been ascertained with so little difficulty.

Again, it is not quite fair to assert that the appellant refused to account. This particular sale brought the aggregate sales of the property to a sum in excess of $40,000. By the terms of the contract (par. 8), the appellant was then entitled to collect for commissions. Nothing in the contract required it to pay the money over and then receive it back from the respondents. It was sufficient for it to pay the difference after deducting the earned commissions. This it offered to do, but when the account was attempted to be taken, the parties could not agree upon the amount due because of the differences concerning the commissions on the first sale, and no settlement could be reached. This, however, does not amount to a refusal to account. The dispute was not whimsical but was in good faith, and the fact that the appellant did not accede to the respondents' contentions could not be said to be a refusal to account, or to authorize the respondents to repudiate the contract.

As to the third contention, the evidence leaves no doubt in our minds that the appellant procured a purchaser for the

remaining property. After procuring the purchaser, it prepared a contract of sale in the form of a time sale authorized by the contract and tendered it to the respondents for execution. The respondents refused to execute it, assigning two reasons, first, that the contract was at an end because of the appellant's refusal to account for the money received by it; and second, because the contract as prepared contained a clause requiring the execution of deeds to single lots when payments equaled a certain sum; a clause not warranted by the contract under which the appellant was empowered to sell. Later, and on the day before the contract expired by its own limitation, the appellant procured the cash price of the property, went to the home of the respondents, where the business of the parties had been usually transacted, and finding Lydia Parker alone in the house, tendered to her the full cash price of the property according to the prices fixed in the contract, and demanded a deed to its purchaser, subject to the taxes and assessments then due thereon. It accompanied its tender also with the sum it admitted to be due on sales theretofore made after deducting its earned commissions. Mrs. Parker refused to accept the money and the matter then rested. The first tender was properly refused for the second reason given for the refusal, but clearly the second tender was a valid tender timely made. Undoubtedly, had the respondents accepted the tender, they would have been entitled to a reasonable time in which to prepare, execute, and deliver a deed, and it may be that equity would have relieved them of their default had they, within a reasonable time, tendered a deed on consideration of receiving the money which had been tendered. But they did neither, and under the contract the appellant became entitled to its commissions on the sale; it produced a purchaser ready, able, and willing to take the property according to the terms on which it had the property for sale.

The respondents argue in this connection that the tender became inoperative because not kept good. We do not know

that we fully understand the purport of this. If it be meant that the appellant should have paid the money into the registry of the court on filing its answer, or should have deposited it in some public depositary, such as a bank, for the respondents' use, we cannot agree with the contention. On the refusal of the respondents to accept the tender when made, the default was theirs. As we have said, since they had a reasonable time in which to execute a deed, equity might have relieved them from the default had they tendered the deed within a reasonable time after refusing the tender; but their failure to either accept at the time of the tender, or within a reasonable time thereafter, made the default their own and relieved the appellant of any further duty.

It is said that the purchaser was not produced within the meaning of the rule laid down in *Barnes v. German Savings & Loan Society*, 21 Wash. 448, 58 Pac. 569. But, if we have correctly caught the drift of the contention, all that the appellant failed to do was to bring its purchaser bodily into the presence of the respondents. This it was not required to do in order to comply with its contract, and we cannot regard the case cited as so holding. It was enough when it brought and tendered to the respondents its purchaser's money and demanded a deed in the name of the purchaser.

There is a dispute in the evidence as to the amount of cash actually tendered to Mrs. Parker on account of the sale to Isabella Whyte. It is conceded that the court was in error in its finding that two lots in block four remained unsold, and that the correct finding should have been that only one lot in that block remained unsold. These lots were priced in the contract at $300 each. The purchase price was, therefore, $3,600, and the testimony of Mr. Sander was that he tendered $3,972, the amount in excess of the purchase price of the lots being the amount he conceded the appellant had collected and not accounted for. Mrs. Parker, on her cross-examination, testified that she told her husband and son that the amount tendered was $3,972, but later on, in her direct examination,

she testified that Mr. Sander told her the amount was $5,000; that the money was not counted out. As we view the record, there was no necessity for a tender in excess of the contract price of the lots to entitle the appellant to a performance, and as either amount is in excess of that sum, the exact amount tendered is not necessary to be determined.

The respondents offered no testimony as to the amount the appellant had actually paid of the moneys received by it on the purchase price of the lots. Mr. Sander testified that the sum was $37,453. In addition to this he claimed a credit of $100, due from a Mr. Olson to the respondents on the purchase price of a lot sold under contract which had not then been paid. Adding to these credits the amount due the appellant as commissions, and deducting the aggregate from the amount received from the sales, would leave a balance of $422, the amount the appellant paid into the registry of the court. While the evidence is not very clear as to the $100 item, it seems to have been conceded elsewhere in the record by both parties that the sum of $2,550, received from the sales to the individual purchasers, was the aggregate total of the sales. If this be the fact, the item was included in that total, and could not be charged as an additional credit merely because the sum had not been actually paid over. As the record stands, we think the item should not be allowed.

As we view the record, therefore, the respondents were entitled to a judgment against the appellant for the sum of $522, with the costs and disbursements of the action, on which should be credited the sum paid into court for their use. The judgment is reversed, and the cause remanded with instructions to enter a judgment accordingly. The appellant will recover its costs in this court.

ELLIS, C. J., MOUNT, HOLCOMB, and PARKER, JJ., concur.